**Andrew Dean**
**Dugan Bliss**
**Salvatore Massa**
**Vincent Hull**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**212-336-0971 (Bliss)**
**blissd@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**WILLIAM SADLEIR,**<br><br>**Defendant.** | **<u>COMPLAINT</u>**<br><br>**20 Civ. 3997**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant William Sadleir ("Defendant" or "Sadleir"), alleges as follows:

**SUMMARY**

1. This is a securities fraud case in which Sadleir engaged in a longstanding scheme to misappropriate millions of dollars from a publicly traded investment company known as BlackRock Multi-Sector Income Trust ("BIT"), using a sham company and forged signatures.

2. Sadleir was the owner and founder of Aviron Group, LLC, which was the parent of several film distribution and related companies (collectively with parent, "Aviron"). BIT invested approximately $75 million net in Aviron's film distribution business through two notes, which were securities, issued in 2015 and 2017, respectively. In 2017, Sadleir fraudulently

diverted over approximately $25 million to a sham company he owned and operated. Sadleir falsely represented to BIT that the sham company was affiliated with a legitimate media company performing work to market and promote Aviron's business. Sadleir also misappropriated for his personal use at least approximately $13.8 million of BIT's invested funds. Sadleir used the misappropriated money to support his lavish lifestyle, including cash withdrawals and the purchases of a luxury car and a mansion in Beverly Hills. Then, in 2019, Sadleir forged BIT personnel signatures to authorize the release of collateral BIT valued at approximately $3 million that it had secured to protect its interest in the notes.

## VIOLATIONS

3. By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

6. The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations

alleged here and to pay prejudgment interest thereon; (c) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendant from directly or indirectly, including, but not limited to through any entity he owns or controls, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities for his own personal account; and (e) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

8. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

9. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. BIT conducts business operations in this District, is advised by BlackRock Advisors, LLC in this District, is traded on the New York Stock Exchange in this District, and many of the acts, practices, transactions, and courses of business involving BIT's investments in Sadleir's company Aviron occurred in this District.

**DEFENDANT**

10. **Sadlier**, age 66, a resident of Beverly Hills, California, was the founder of Aviron Group, LLC, a holding company engaged in the film distribution business. Sadleir owned and controlled Aviron Group, LLC and its subsidiaries until December 19, 2019, when he was removed from most of the subsidiaries for defaulting on a BIT note.

## OTHER RELEVANT ENTITIES

11. **BIT** is a Delaware statutory trust traded on the New York Stock Exchange that operates as a registered closed-end management investment company and is advised by BlackRock Advisors, LLC and related entities. BIT invests in loans and other debt instruments to generate income. BIT's shares are publicly traded and may be purchased by retail investors.

12. **Aviron Group, LLC** is a Delaware limited liability company based in Beverly Hills, California that is owned and was founded by Sadleir. Aviron Group, LLC is a holding company with several subsidiaries engaged in the business of film distribution that were solely owned and controlled by Sadleir, and in some cases by a trust controlled by Sadleir. In approximately December 19, 2019, Sadleir lost control of many of Aviron Group LLC's subsidiaries.

13. **GroupM Media Services, LLC** is a Delaware limited liability company established by Sadleir in October 2016 that served as a vehicle for Sadleir to misappropriate BIT funds. The entity's name bears a close resemblance to one of the world's largest advertising media companies.

## FACTS

### I. BIT INVESTS IN SADLEIR'S COMPANY AVIRON

14. From October 2015 until April 2019, BIT invested approximately $75 million net in Sadleir's company Aviron through two notes and related agreements. For Aviron, the purpose of the notes and related agreements was to raise money to finance Aviron's efforts to distribute specific films. Generally, a film distributor markets films to get them into theaters and onto streaming services and receives revenue from those sources. For BIT, the purpose of its investment was to profit in the form of interest payments and capital appreciation from Aviron

warrants.

**A. The First Note**

15. On October 20, 2015 Aviron and BIT entered into the first note, also known as the credit and security agreement (the "First Note"). The First Note operated as a secured credit facility to provide funding to support Aviron's efforts to distribute specific films and provided BIT warrants in Aviron. The First Note had a 15% interest rate. Under the terms of the First Note, all principal and interest were due in one year, and Aviron was required to make quarterly interest payments. The First Note contained a number of restrictions on Aviron's use of the BIT proceeds including a prohibition against engaging in affiliate transactions. The First Note provided BIT the option to extend the maturity of the note for an additional four years. An extension would have the effect of extending the due date for Aviron to repay the principal. Aviron's revenue streams and associated rights to, or property of, the films acted as collateral under the First Note. Aviron and Sadleir also could not use the investments for activities unrelated to film distribution. The First Note defined any funding provided by BIT as an "investment." As part of the agreement, BIT also obtained warrants it could exercise for LLC interests in Aviron. The terms of the warrants allowed BIT to acquire a specified share class of LLC interests in Aviron. BIT could acquire the LLC interests for $1,000 per unit. The number of units available for exercise was determined by a formula that was derived in part on how much money BIT invested in Aviron and did not have an expiration.

16. In addition to the collateral identified in the First Note, Sadleir agreed – in a separate agreement executed the same day as the First Note – to pledge Aviron's LLC interests in two subsidiaries "to induce [BIT] to . . . extend credit" to Aviron (the "Pledge"). In the event of a default, the First Note and Pledge permitted BIT to acquire Aviron's interest in the two

subsidiaries.  Consistent with the First Note and the Pledge, and to protect its interest, BIT filed UCC liens on all of the collateral from both agreements: the film distribution rights and properties, as well as the LLC interests of the two Aviron subsidiaries.

17. The First Note provided for an initial investment by BIT of $12 million, which occurred in October 2015, after which Aviron was required under the First Note to make additional written representations for any additional investment.  Those representations included an assurance that the funds would be used in connection with a specified film project and that Aviron had not defaulted on any of the terms of the First Note.

18. BIT extended the one-year term of the First Note on October 19, 2016 and ultimately provided $21 million in additional funding for film distribution projects pursuant to the First Note as extended.  The extension also kept the terms of the Pledge in place.

**B.     The Second Note**

19. On July 17, 2017 Aviron and BIT entered into the second note, which replaced the First Note, and was also known as the note purchase and security agreement (the "Second Note").  The Second Note increased the total investment amount that BIT made available to Aviron, up to $75 million.  The Second Note had a term of three years, but provided that BIT could enter into one or two one-year extensions.  Aviron's outstanding debt under the First Note was rolled into the Second Note.  As a result, the $75 million in funding available under the Second Note included the outstanding balance of the First Note.  The interest rate of the Second Note varied:  Aviron was required to pay 15% interest on pre-existing debt from the investments under the First Note, which at that that time totaled approximately $11.6 million.  For new investments, the interest rate was 5%.  The agreement required Aviron to make quarterly interest payments and the principal was due by the maturity of the note.  BIT eventually invested

approximately $50.6 million in new money under the Second Note.

20. The Second Note reiterated that its purpose was to fund Aviron's efforts to distribute films. As additional collateral for its investments, Aviron granted rights to LLC interests in additional subsidiaries that were to be established to hold the rights to subsequent films. Contemporaneous with the Second Note, BIT and Sadleir amended the Pledge so that it remained in effect with respect to the Second Note. In addition, BIT maintained its rights to the Aviron warrants from the First Note and extension, and increased the number of Aviron units available to BIT under the warrants.

21. The Second Note also required Sadleir and Aviron to comply with certain conditions in order to receive investments unless BIT expressly waived that provision. For example, Aviron and Sadleir could not sell collateralized assets for which BIT had effected a lien pursuant to the First Note, Second Note, and Pledge. Aviron and Sadleir also could not enter into affiliated transactions or use the investments for activities unrelated to film distribution.

22. The Second Note, like the First Note, allowed BIT to transfer its interest in the note to others. The Second Note incorporated additional language on transferability that acknowledged that the Second Note was a security under the Securities Act. In particular, the Second Note states that it is not registered and that BIT meets the requirements of the "accredited investor" definition in Rule 501 of Regulation D of the Securities Act for purposes of the transaction with Aviron.

23. In April 2019, BIT invested $10 million in Aviron under the Second Note to fund its distribution efforts for a specified film, which was memorialized in two letter agreements (the "Letter Agreements") that were executed the prior month. The Letter Agreements did not change the terms of the Second Note, but rather supplemented them. The Letter Agreements

required repayment of the $10 million in investments within sixty days after the specified film's release. As collateral for the Letter Agreements, Sadleir pledged LLC interests in 11 Aviron entities: Aviron Group, LLC and ten subsidiaries.

## II. SADLEIR MISAPPROPRIATES BIT ASSETS USING A SHAM COMPANY

24. By no later than October 2016, Sadleir began a scheme to defraud BIT by fraudulently diverting and misappropriating a portion of its investments. Sadleir used a substantial portion of the diverted funds for himself and to support his lavish lifestyle.

### A. Sadleir Uses GroupM Media Services, LLC to Misappropriate Funds

25. In October 2016, Sadleir formed GroupM Media Services, LLC which he used as a vehicle to misappropriate BIT funds. The entity's name bears a close resemblance to GroupM, which describes itself as one of the world's leading media investment companies. An affiliate company of GroupM had an ongoing business relationship with Aviron to provide media services. Sadleir, either directly or through others at his direction, established a corporate website for his sham entity purporting to provide media services, obtained a New York phone number, and obtained an email address for a fictitious individual named Amanda Stevens purporting to work for the entity. Through this deceptive conduct and numerous misrepresentations to BIT, Sadleir intentionally sought to deceive BIT into thinking that GroupM Media Services, LLC was affiliated with the legitimate company with a similar name and that at one point had provided similar services to Aviron.

26. Sadleir created fake documents dated as of December 2016, February 2017, and October 2017, purporting to be invoices directed to his company Aviron, and requesting payment be made to his sham company GroupM Media Services, LLC for purported marketing credits or services from a legitimate company affiliated with the real GroupM. Those purported invoices

diverted more than $25 million to Sadleir's sham company and were fraudulent: Sadleir's GroupM Media Services, LLC did not provide any marketing credits or services to Aviron. And the invoices, which Sadleir signed, falsely represented that they were from "a GroupM company," when in fact the fake documents were from Sadleir and directed payment to his sham company's bank account.

27. Relying on the fake December 2016 and February 2017 invoices, BIT authorized Aviron to release funds to GroupM Media Services, LLC. Aviron appears to have released the funds reflected in the fake October 2017 invoice without BIT's prior knowledge or authorization. Specifically, Sadleir's fraudulent invoices claimed to support the following payments to GroupM Media Services, LLC, as described in Table 1:

**Table 1: Fraudulent Payments to GroupM Media Services, LLC
As Reflected In Fake Invoices**

| **Invoice Date** | **Invoice Paid Date** | **Invoice Amount (Stated and Paid)** |
|---|---|---|
| December 13, 2016 | January 13, 2017 | **$460,000** |
| February 17, 2017 | February 27, 2017 | **$12.1 million** |
| October 10, 2017 | October 16, 2017 | **$13.5 million** |

28. The payment BIT authorized in connection with the fake December 2016 invoice had been previously released from the account of another third party who provided Aviron with financing. BIT funds reimbursed Aviron for the payment. The payment BIT authorized in connection with the fake February 2017 invoice was paid from an Aviron entity account to Sadleir's GroupM Media Services, LLC after receiving proceeds from BIT. And the payment in connection with the fake October 2017 invoice was paid to GroupM Media Services, LLC from an Aviron entity account using at least $9 million from BIT proceeds.

29. In an effort to further perpetrate and conceal his fraud, Sadleir made several misrepresentations to BIT concerning his sham company GroupM Media Services, LLC and these fake invoices. After Sadleir shared the first GroupM Media Services, LLC invoice with BIT, on December 22, 2016 Sadleir e-mailed BIT's portfolio manager, asked him to authorize payment, and falsely conveyed that the fake invoice was, in fact, from the real GroupM, which he described as "the largest advertising media company in the world[.]" On January 5 and 11, 2017 Sadleir twice again asked BIT's portfolio manager by e-mail to authorize payment of the first fake invoice and again conveyed that the payment would go to the real GroupM for media services work. These representations were false: the fake invoice fraudulently directed payment to Sadleir's GroupM Media Services, LLC, not the real GroupM. Rather, Sadleir diverted or misappropriated the funds.

30. Sadleir made similar misrepresentations concerning the February 17, 2017 invoice. On February 17 and 23, 2017 Sadleir e-mailed BIT personnel requesting payment of the second fake invoice and again conveyed that the payment would go to the real GroupM for media services work. These representations were false for the same reasons: the fake invoice fraudulently directed payment to Sadleir's GroupM Media Services, LLC, not the real GroupM. Rather, Sadleir diverted or misappropriated the funds.

31. Months after the payments were made pursuant to the fake invoices, Sadleir continued his efforts to conceal his fraud. On several occasions including on at least June 19, 2018, March 12, 2019, and September 16, 2019, Sadleir or Aviron personnel acting at his direction e-mailed BIT personnel and conveyed that the payments were made to the real GroupM and that the real GroupM had provided or would provide in the future certain media services work to Aviron. And from at least November 2019 through February 2020, this concealment

continued with e-mails from the fictitious Amanda Stevens (created by Sadleir) at GroupM Media Services, LLC, which were sent to BIT or agents of BIT.  These e-mails also falsely claimed that Aviron had over $27 million in media credits with GroupM.  In fact, the real GroupM did not have a relationship with Aviron during the time of any of these e-mails and Aviron did not have any pending credits or services owed from the real GroupM.

32.     Sadlier misappropriated at least the majority of funds obtained through his sham company and used the proceeds for purposes unrelated to film distribution.  Instead, he used them to fund his lavish lifestyle.  Among other things, Sadleir used the misappropriated funds to: purchase a $14 million mansion in Beverly Hills (approximately $4 million of the purchase amount may have been sourced from Aviron-related revenue); spend nearly $3 million to remodel Aviron's offices; pay himself and his wife over $350,000; pay $254,000 to settle a legal dispute; buy a $127,000 Tesla; and spend about $109,000 on home furnishings and remodeling.

33.     Sadleir's deceptive conduct, misrepresentations, and omissions, including as described herein, were material: a reasonable investor would have wanted to know that his or her investment and related collateral was being fraudulently diverted and misappropriated.

## II.     SADLEIR MISAPPROPRIATES BIT COLLATERAL

34.     As described above, Sadleir's fraudulent diversion and misappropriation of funds that were intended to benefit the Aviron entities, some of which served as collateral to BIT, meant that Sadleir was also devaluing BIT's collateral.  In addition, in approximately July 2019, Sadleir continued his scheme to misappropriate BIT assets, this time using a new strategy: forging BIT personnel signatures to fraudulently release liens on Aviron assets, and reselling those assets to third parties.

35.     In March 2019 Sadleir had requested additional funding from BIT for a new film

distribution project. Pursuant to the Second Note, Sadleir and BIT entered into the Letter Agreements that totaled $10 million in proceeds to be made available for such purposes under that note. Shortly after the agreements were executed, BIT transferred $10 million to Aviron in April 2019.

36. To protect its interests in that collateral, BIT filed liens on the specified assets in Delaware under the Uniform Commercial Code ("UCC"). BIT filed multiple liens with each one defining a set of distinct assets—such as the revenue streams and rights to distribute a particular film. Under the First Note and Second Note, Aviron and Sadleir could not unilaterally release the liens, but rather required BIT to consent to such a release.

37. During July 2019, Sadleir drafted at least five fake agreements between BIT and Aviron for which he forged the signatures of the BIT portfolio manager. These forged agreements enabled Sadleir to have fourteen UCC amendments filed to remove BIT's liens on Aviron's film distribution revenue streams. These amendments further enabled Sadleir to misappropriate collateral valued by BIT at approximately $3 million that he may have re-sold or attempted to re-sell to third parties.

38. By October 2019, BIT learned about the unauthorized UCC amendments to the liens, which led to a confrontation with Sadleir. In a phone call on November 25, 2019 with BIT personnel, when confronted about the unauthorized amendments and forgeries, Sadleir admitted he had "fucked up."

39. Sadleir's deceptive conduct, misrepresentations, and omissions, including as described herein, were material: a reasonable investor would have wanted to know that his or her investment and related collateral was being fraudulently diverted and misappropriated.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

40. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 39.

41. Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

42. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

43. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 39.

44. Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one

or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

45. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

**III.**

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently prohibiting Defendant from directly or indirectly, including, but not limited

to through any entity he owns or controls, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities for his own personal account; and

**V.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
May 22, 2020

                                      s/Dugan Bliss
                                      Andrew Dean
                                      Dugan Bliss
                                      Salvatore Massa
                                      Vincent Hull
                                      Attorneys for Plaintiff
                                      SECURITIES AND EXCHANGE COMMISSION
                                      New York Regional Office
                                      Brookfield Place
                                      200 Vesey Street, Suite 400
                                      New York, New York 10281-1022
                                      212-336-0971 (Bliss)
                                      blissd@sec.gov